UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. 1:24-cr-00144-JAW** |
| | ) | |
| XISEN GUO | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REVISED SENTENCING MEMORANDUM**

NOW COMES the Defendant, XISEN GUO, by and through Zerillo Law Firm, LLC, and respectfully submits his Revised Sentencing Memorandum for consideration by the Court.

## I.      REVISION

Defendant submits this Revised Sentencing Memorandum to provide additional information to this Court about his dementia screenings and recently discovered health problems, to supplement *Defendant's Exhibits 1* and *2* with an updated letter from Nurse Practitioner Jeff Yang (hereinafter "NP Yang") dated August 6, 2025 and add additional medical records.

For reference, the amendments are found in Section III(G) on pages 6 through 11, and Section IV(C) and (D) on pages 14 through 26..

## II.      INTRODUCTION

On January 13, 2025, Xisen Guo plead (hereinafter "Xisen") guilty by information to Count 1, charging him with Maintaining a Drug-Involved Premises.[1]  (ECF No. 38).

For the reasons described herein, Xisen respectfully requests that this Court sentence him to a time-served sentence[2] followed by probation, based on the requested departures, the application of the sentencing factors set forth in 18 U.S.C. § 3553(a), the nature and

---

[1] In violation of 21 U.S.C. § 856(a)(1).
[2] According to the United States Marshals Service, Xisen has, so far, served five days of Federal incarceration.

circumstances of the offense, and the characteristics unique to Xisen. *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008).

## III.  FACTUAL BACKGROUND

### A.  Childhood History

On July 28, 1956, Xisen was born in the Guangdong Province of China.  His parents, Bing Wan Guo and Xiling Mui, lived on a grain farm in a very rural area with their seven children.  *Revised PSIR*, ¶36.  Xisen has six siblings and is the fourth oldest.  *Id.*

Under the policies of the Chinese Communist Party (hereinafter "CCP"), life for Xisen and his family was difficult.  *Id.*  In China, as part of its plan to industrialize, the CCP instituted grain quotas on rural farmers.[3]  Xisen's family was no exception.  His household was required to turn over most of the grain it produced to the government in return for minimal compensation. *Revised PSIR*, ¶36.  This policy soon caused a nationwide famine from 1960 to 1962 that killed at least thirty million people.[4]  The grain quotas caused extreme poverty for Xisen's family. *Revised PSIR*, ¶36.  Food was scarce for his entire village.  Any meals his family was fortunate enough to have consisted of rice and scraps of any other edible food they could find.  New clothes were a luxury they could not afford.  Xisen described the family's attire as limited, ragged, and unable to keep them warm.  The family home itself was a one-room space with a dirt floor.  *Id.*  All nine family members slept in this space.  *Id.*  Thankfully, Xisen's family survived the famine.

His day-to-day life as a child was simple and monotonous.  Xisen would wake up, walk to school, attend class, walk home, help around the farm, and go to bed.  Xisen's chores consisted of: fetching water, watering the crops, and picking up animal waste for fertilizer.  Once

---

[3] https://courses.bowdoin.edu/history-2203-fall-2020-scooper3/course-description/crop-procurement/
[4] https://www.asianstudies.org/publications/eaa/archives/chinas-great-leap-forward/

he was in fourth grade, his parents required him to help plant and harvest grain. Xisen's education was standard for children living in the area. The children in his village all attended the same school, which consisted of a single room containing only a lightbulb. Children were required to purchase their own school supplies and books, but his family could not afford these luxuries. Despite these challenges, Xisen attended regularly and completed his schooling.

### B.    Adult Life in China

After completing his education, as an adult, Xisen continued to live with his family and work on the farm.

In 1984, Xisen married his first wife, Aibao Chen. *Revised PSIR*, ¶37. Three children, now adults, were born from their marriage: Kimberly Guo, Wei Cheng Guo, and Wei Liang Guo. *Revised PSIR*, ¶38. Aibao and their children lived with Xisen and his extended family. *Revised PSIR*, ¶37. However, Aibao wanted Xisen to earn enough money to individually support their new family. Unfortunately, employment was hard to come by. Under CCP policies, party officials assigned jobs to citizens, which led to difficulties in Xisen obtaining a job.[5] As a result, the only work available for Xisen and his family was manual labor on other farms or other odd-jobs for very little pay. This financial stress caused insecurity and internal disputes within the family. Eventually, Xisen, Aibao, and the children moved out of his family home and into his older sister's house in the nearby countryside. At some point later Xisen and Aibao divorced.

In 1989, the nationwide student protests and Tiananmen Square massacre led to unrest amongst the Chinese population, government crackdowns, mass arrests, and CCP purges of party dissidents.[6] Given the national chaos and his recent divorce, Xisen decided to leave China. *Revised PSIR*, ¶39. He did not have a specific destination in mind, but wanted to end up

---

[5] https://www.bostonreview.net/articles/the-power-of-the-party/
[6] https://library.indianapolis.iu.edu/digitalcollections/TS

3

somewhere safe.

Between 1989 and 1991, Xisen lived in Belize.  He worked in a restaurant as a cook for very little pay.  Xisen was unable to afford to live on this amount of money.  After a year and a half, Xisen moved to the United States in the hopes of finding a liveable wage and affordable living conditions.

### C.    Move to New York City

In 1991, Xisen moved to New York City.  *Revised PSIR*, ¶38.  He was able to find work ironing clothes for a textile manufacturer—a job he kept for the next twenty years—and working at a meat processing facility.  *Revised PSIR*, ¶50.  While Xisen worked in the United States, he sent money home to his family as often as possible since they were in desperate need of food and daily supplies.  *Revised PSIR*, ¶37.

In 1993, Xisen's children left China and moved to the United States.  At that time, a relative helped Xisen reconnect with his children over dim sum.[7]  Up to this point, Xisen had very little prior contact with his children due to their extensive time and great distance apart. Unfortunately this meeting did not result in much of a connection.  As his children continued to grow up in the United States, it became clear to Xisen that the cultural differences between himself and his children and his long absence hindered a meaningful relationship they may have had.

In 2015 or 2016, after multiple attempts to pass the citizenship test, Xisen became a United States citizen.  *Revised PSIR*, ¶41.

### D.    Move to Maine and Return to New York City

Through a mutual friend, Xisen met Siu Long Ham.  *Revised PSIR*, ¶42.  Mr. Ham

---

[7] Dim sum is a traditional Chinese meal made up of small plates of dumplings and other snack snacks and is usually accompanied by tea. The dishes are shared among family and friends.
 https://asiasociety.org/reference/what-dim-sum-beginners-guide-south-chinas-traditional-brunch-meal

requested Xisen's help with renovating 549 Main Road, Passadumkeag, Maine (hereinafter "Passadumkeag property"). *Id*.

On December 27, 2019, Xisen and Xianmin Chen, as partners, formed GC 186 Realty, LLC (hereinafter "GC 186") for "real estate investment" purposes. *Revised PSIR*, ¶14.

In early 2020, Xisen moved to Maine and, on February 21, 2020, using GC 186, purchased the Passadumkeag property. *Id*.

For four years Xisen resided in Maine and, with other persons, used the Passadumkeag property to grow marijuana. *Revised PSIR*, ¶12.

In February of 2025, while this matter was pending and while on pretrial release, Xisen moved back to New York City. *Revised PSIR*, ¶44. The City allows him to be surrounded by others from his culture, which he appreciates. Although Xisen's life is difficult due to his limited Social Security income, old age, and health issues, he still finds time to connect with other members of the Chinese community. This includes, but is not limited to: taking walks in the park, grabbing coffee with other community members, and enjoying dim sum.

### E.    Future for Xisen and His Family

Despite their family troubles, Xisen is motivated to re-establish his relationship with his adult children. For example, Kimberly provides significant assistance by translating, interpreting, and assisting Xisen with medical appointments and navigating a very intricate New York City. *Revised PSIR*, ¶38. Xisen does not speak or understand English and has difficulties with taking the correct bus lines or subway connections. *Id*.

### F.    Criminal History

Prior to this case, Xisen has no criminal convictions and has never been charged with a crime. Xisen was initially charged by the State of Maine, but that was later dismissed and he

was charged from the same conduct leading to the charges in this case.

### G.    Physical and Mental Health

#### 1.    Current Physical and Mental Health

Xisen is 68 years old.  Enclosed with this Sentencing Memorandum are two Amended Exhibits: *Amended Exhibit 1* contains Xisen's medical records[8] and *Amended Exhibit 2* is a letter from NP Yang.  These exhibits describe him as being in poor physical health and experiencing a number of ailments that include, but are not limited to: (1) at least three dementia screenings[9], (2) enlarged prostate, (3) pain and paresthesia[10] of the right arm relating to a deformity[11], (4) thrombocytopenia[12], (5) deep vein thrombosis (hereinafter "DVT")[13], (6) nutritional anemia[14], (7) nicotine dependence, (8) sinus bradycardia[15], (9) feet swelling, (10) cholesterolosis of the

---

[8] Counsel notes that on multiple occasions throughout the records Xisen is referred to as "Xi S" or "Xi," but at the same time represents to this Court that the records refer to the Defendant.

[9] Dementia is a general term for loss of memory, language, problem-solving and a decline in cognitive abilities. Dementia symptoms trigger a decline in cognitive abilities, severe enough to impair daily life and independent function. They also affect behavior, feelings and relationships.  Dementia symptoms are progressive, which means that the signs of cognitive impairment start out slowly and gradually get worse over time, leading to dementia. https://www.alz.org/alzheimers-dementia/what-is-dementia

[10] Paresthesia is the feeling of tingling, numbness or "pins and needles." https://my.clevelandclinic.org/health/symptoms/24932-paresthesia

[11] Xisen's right arm was crushed when he was around age twelve.  The arm was only placed in a splint due the medical care available.  Unfortunately, his arm did not properly heal, resulting in a visual deformity around the wrist.  Since the accident, Xisen has experienced numbness and pain in his right wrist.

[12] A condition in which a person has a low blood platelet count. https://www.mayoclinic.org/diseases-conditions/thrombocytopenia/symptoms-causes/syc-20378293#:~:text=Thrombocytopenia%20is%0a%20condition%20in,plugs%20in%20blood%20vessel%20injuries

[13] A condition in which a blood clot develops in the deep veins, usually in the lower extremities. A pulmonary embolism occurs when a part of the DVT clot breaks off and travels to the lungs, which can be life-threatening. https://wwwnc.cdc.gov/travel/yellowbook/2024/air-land-sea/deep-vein-thrombosis-and-pulmonary-embolism#:~:text=Deep%20vein%20thrombosis%20(DVT)%20is,DVT%2C%20PE%2C%20or%20both

[14] Inadequate intake and malabsorption of certain vitamins and minerals, including iron, vitamin B12, folate, and copper.  https://badgut.org/information-centre/health-nutrition/anemia-nutrition/

[15] Sinus bradycardia is a heart rhythm where the heart beats slower than expected (under 60 beats per minute for adults) but otherwise works normally.  It is typically treatable with medications or a permanent pacemaker. https://my.clevelandclinic.org/health/diseases/22473-sinus-bradycardia

gallbladder[16], (11) hyperlipidemia[17], (12) chronic sinusitis[18], (13) thoracic disc degeneration[19], (14) pancreatic cyst[20], (15) chronic occluded iliac vein stent in his left leg[21], (16) stage 3 chronic kidney disease[22], and (17) a risk for having prostate cancer. *Defendant's Amended Exhibit 1,* at 22, 124-129, 138-143, 159, 162-168, and *Defendant's Amended Exhibit* 2.

For each six hour trip to Maine from New York, and vice versa, Xisen experiences leg pain and swelling. *Defendant's Amended Exhibit 1,* at 20. On occasion, this pain and swelling can last for days. *Id*, at 74.

### 2.    Dementia Screenings

Turning to the issue of Xisen's dementia, Xisen had been subjected to three examinations: the Saint Louis University Mental Status Examination (hereinafter "SLUMS exam"), the Mini-Cog test, and the Dementia Severity Rating Scale (hereinafter "DSRS").

---

[16] Cholesterolosis of the gallbladder is characterized by the accumulation of cholesterol on the inner walls of the gallbladder. This fat or lipid accumulation forms plaques or polyps.
https://my.clevelandclinic.org/health/diseases/21821-gallbladder-polyps
[17] Hyperlipidemia (high cholesterol) is an excess of lipids or fats in the blood. This can increase a person's risk of heart attack and stroke because blood cannot easily flow through the arteries.
https://my.clevelandclinic.org/health/diseases/21656-hyperlipidemia
[18] Sinusitis is an inflammation of the sinuses. The condition lasts 12 weeks or longer, even with treatment. Symptoms can include thick, discolored mucus, pain, tenderness, and swelling, as well as reduced sense of smell and taste. https://www.mayoclinic.org/diseases-conditions/chronic-sinusitis/symptoms-causes/syc-20351661
[19] The thoracic spine is the area of your spine below your neck connected to your ribs. It is made up of 12 vertebral bodies with intervening discs. The disc is a cartilage, gristle-like material that sits between your vertebral bodies in all parts of your spine. The disc acts like a cushion and also allows flexibility in your spine. The disc can wear over time as we age or earlier if it is injured. As it wears, or degenerates, the space between the vertebral bodies is reduced. https://www.uclahealth.org/medical-services/spine/conditions/thoracic-disc-degeneration
[20] A fluid-filled growth on the inside or outside of the pancreas. Most are not cancerous, and many do not cause symptoms. But some pancreatic cysts can be or can become cancerous.
https://www.mayoclinic.org/diseases-conditions/pancreatic-cysts/symptoms-causes/syc-20375993
[21] Iliac vein stenting is performed when a vein is blocked and the issue is not resolved *via* angioplasty or lysis. Chronic occlusion occurs when the stent is blocked. Chronic iliac vein stent occlusions can lead to severe symptoms such as ambulatory venous hypertension, the emergence of incompetent valves, venous claudication, and often tissue loss. https://pmc.ncbi.nlm.nih.gov/articles/PMC11212500/
[22] Stage 3 Chronic Kidney Disease means that the kidneys have mild to moderate damage and are less able to filter waste and fluid out of the blood. Poor filtration can lead to complications, such as high blood pressure, anemia, and problems with bones.
https://www.kidneyfund.org/all-about-kidneys/stages-kidney-disease/stage-3-chronic-kidney-disease-ckd-causes-symptoms-and-treatment

On June 2, 2025, NP Yang conducted the SLUMS exam. *Defendant's Amended Exhibit 2*. The SLUMS exam is a screening tool used to detect/identify potential cognitive impairment and dementia. *Id*. The SLUMS exam consists of a series of different types of questions and simple commands. *Id*. The maximum score is 30 and for persons with a minimum high school level education, a normal score is 27-30 points, a score of 21-26 points indicates a mild neurocognitive disorder, and a score between 1 and 20 indicates dementia. *Id*. Xisen scored 10 points, which falls under the category of dementia. *Id*. As described in NP Yang's letter, the SLUMS exam is a screening tool, not a diagnostic exam. *Id*. NP Yang recommends that Xisen follow up with a neurologist to either confirm or rule out dementia. *Id*.

According to Professor Panita Limpawattana[23], the Mini-Cog test is a validated mild neurocognitive disorder (hereinafter "mild NCD") detection tool used to detect dementia.[24] Mild NCD is a stage of pre-dementia and must be recognized early to be treated effectively. *Id*. Professor Limpawattama reports that there is a high probability that mild NCD will progress to dementia. *Id*. The Mini-Cog test has been effective in showing high sensitivity and specificity for cognitive impairment. *Id*. The test consists of a clock drawing test and a three-item recall test. *Id*. The maximum score is 6 points, with 3 points allocated to the word recall portion and 3 points allocated to the clock drawing portion. *Id*. *Defendant's Amended Exhibit* 1, at 144. Xisen scored 3 points, which puts him in the category of a positive dementia screening. *Defendant's Amended Exhibit* 1, at 144.

---

[23] Panita Limpawattana is an Associated Professor of Internal Medicine. She is a geriatrician and is currently the head of the Division of Geriatric Medicine, Internal Medicine Department, Faculty of Medicine, at the Khon Kaen University in Thailand. She is a lecturer, and her research focuses on geriatric syndromes including dementia, frailty, sarcopenia, and falls. https://sciprofiles.com/profile/1020747
[24] https://pmc.ncbi.nlm.nih.gov/articles/PMC8482262/

According to Dr. Stephen Moelter[25], et. al., the third test, the DSRS, is a highly reliable multiple-choice questionnaire tool used to measure a patient's functional abilities.[26]  The DSRS is completed by a third person, not the patient.  *Id*.  The maximum score on the DSRS is 54 points indicating extreme impairment, while the lowest is zero indicating no impairment.  *Id*. The DSRS for Xisen was completed on June 26, 2025.  *Defendant's Amended Exhibit 1*, at 148-151.  On the questionnaire, Xisen scored 24 points, which puts him in the moderate range. *Id*.

While these three screenings are tools to indicate impairment, they cannot be substituted for a formal diagnosis by a neurologist.  All three screening tools indicate impairment and it is crucial that Xisen be evaluated by a neurologist in order to either rule out or confirm a dementia diagnosis.   Due to the Federal Bureau of Prisons' (hereinafter "BOP") staffing issues and inability to properly treat its aging population (described below) it is critical that Xisen's treatment occurs outside of a prison setting so he can receive the proper assistance he needs in order to prolong his life expectancy.

### 3.    Future Treatment

Almost all of Xisen's mental and medical issues require regular follow-up appointments, subsequent treatments and tests, which include, but are not limited to:

- Xisen's DVT required surgical interventions in 2017 and 2023 to remove blood clots that formed in his left leg.  *Defendant's Amended Exhibit 1,* at 4, 74-77.  Xisen has an extremely high risk for recurrent thrombosis and thrombus formation.  *Defendant's*

---

[25] Dr. Moelter has been studying brain function and dysfunction since 1991 when he was an undergraduate research assistant in a visual neuroscience laboratory at Penn State University. Moelter earned his PhD in Clinical Psychology at Drexel University and completed pre and postdoctoral fellowships in neuropsychology at the University of Pennsylvania School of Medicine.  Dr. Moelter is an Associate Professor at Saint Joseph's University's Department of Psychology.  There, Dr. Moelter teaches neuropsychology, neuropsychological assessment, cognitive psychology, and philosophy of psychology. https://directory.sju.edu/stephen-moelter
[26] https://pmc.ncbi.nlm.nih.gov/articles/PMC4208973/

*Amended Exhibit 1,* at 76.  His surgeons have strongly recommended that Xisen wear a compression stocking on his leg daily.  *Defendant's Amended Exhibit 1,* at 133.  It is also recommended that he take anticoagulant medications for the rest of his life.  *Defendant's Amended Exhibit 1,* at 33, 76.  A stent had been implanted in his left leg to treat the DVT and, as of this date, Xisen's stent has occluded.  *Defendant's Amended Exhibit 1*, at 164.  He needs a further evaluation to determine if vascular surgery is necessary to repair or replace Xisen's occluded iliac stent.  *Id.*

- Xisen's chronic sinusitis led to the development of nasal polyps[27] that were surgically removed in 1994.  *Defendant's Amended Exhibit 1*, at 125. His otolaryngologist advises a sinus wash twice daily to maintain his nasal health.  *Defendant's Amended Exhibit 1*, at 136.  Xisen regularly flushes his sinuses, but polyps may still appear.

- On June 2, 2025, Xisen was screened by NP Yang using the SLUMS exam.  *Defendant's Amended Exhibit 2*.  Xisen needs to be evaluated by a neurologist to either confirm or rule out a dementia diagnosis.  *Id.*

- Xisen has a pancreatic cyst.  *Defendant's Amended Exhibit 1,* at 164.  His medical provider recommended a follow-up MRI to monitor the cyst.  A pancreatic cyst can become cancerous and requires monitoring.  See fn. 19.  Xisen needs further evaluations to determine if an MRI should be done to further characterize the pancreatic cyst.  *Defendant's Amended Exhibit 1*, at 164.

- Xisen's previous prostate examination results showed a mass effect[28] on his bladder.  *Id*, at 126.  A 4Kscore Test, a blood test, was conducted and it was determined that

---

[27] Nasal polyps are painless growths inside the nose or the hollow areas inside the bones of the face, also known as sinuses.  Larger growths or groups of nasal polyps can block the nose. They can lead to breathing problems, not being able to smell and infections.
https://www.mayoclinic.org/diseases-conditions/nasal-polyps/symptoms-causes/syc-20351888
[28] Meaning that it is displacing adjacent structures and, in this case, his bladder.
https://radiopaedia.org/articles/mass-effect?lang=us

Xisen's probability is "intermediate for aggressive prostate cancer." *Id*, at 168. The 4Kscore Test is a triage tool measuring proteins in Xisen's blood and analyzing clinical findings and digital rectal examination results. *Id*. The 4Kscore Test is utilized before a biopsy is made and can provide a probability of prostate cancer, but also does not diagnose or completely rule out prostate cancer. *Id*. Xisen needs to be seen so his prostate can be biopsied to determine if he has prostate cancer. *Id*, at 164. Multiple MRIs were scheduled, but they were unable to be completed due to Xisen's ankle monitor.

- A six month follow-up urinalysis, cytology, and culture. *Id*, at 163.

Xisen currently takes the following medications:

1. Tamsulosin Chloride - prescribed 0.4 mg once a day for treatment for an enlarged prostate. *Defendant's Amended Exhibit 1*, at 128.
2. Eliquis - prescribe 5 mg twice a day for treatment to prevent blood clots. *Defendant's Amended Exhibit 1,* at 128.
3. Meclazine HCL - prescribed 25mg once daily for fainting spells.
4. Halobatasol Propianate Cream - one or twice daily to treat eczema and psoriasis. *Revised PSIR*, ¶46.

## H.   Offense Conduct

Xisen did not come to Maine with the intent to grow marijuana. Initially, Xisen purchased the Passadumkeag property so he could renovate it and resell it for a profit. *Revised PSIR*, ¶42. After Xisen purchased the Passadumkeag property, he rented it to Siu Long Ham. *Revised PSIR*, ¶12. Mr. Ham paid Xisen rent in the form of marijuana. *Id*. Mr. Ham convinced Xisen to start a marijuana growing partnership together. This plan required using the Passadumkeag property to grow marijuana. Xisen was under the impression that growing marijuana was legal in the State of Maine as long as they filed specific paperwork with the

State.[29]  Mr. Ham represented that he had taken care of the paperwork and Xisen assumed this was true.

Around December of 2023, Mr. Ham abruptly left the Passadumkeag property and grow operation.  At that point, Xisen moved into the Passadumkeag property and continued the grow operation.  *Id*.  It was around this time that Xisen learned Mr. Ham had never filed any paperwork.  Unfortunately, this did not deter him from continuing the grow operation.  Xisen then sought out the assistance of other members of the Chinese community to assist him in cultivating marijuana.

Xisen openly acknowledges that his conduct was wrongful and he accepts full responsibility for his behavior.  As a result, he pled guilty to spare the government the time and cost of presenting the case at trial.

IV.    **ARGUMENT**

A.    **Sentencing Framework**

Both the Supreme Court and the First Circuit have outlined the sentencing process.  *Gall v. United States*, 552 U.S. 38 (2007); *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008).  The Court begins its analysis with the calculation of the advisory sentencing range, and considers the appropriateness of any recognized Guidelines departures.  *Martin*, 520 F.3d at 91.  The Court then weighs the arguments of the parties regarding the case and defendant specific facts in light of the factors put forth in 18 U.S.C. § 3553(a).

After a case-specific analysis of those factors, the sentencing court has broad discretion to deviate from the Guidelines, and there is great deference accorded to its decision.  *United States v. Iannarelli*, 524 F.3d 286, 292 (1st Cir. 2008); *Martin*, 520 F.3d at 98.  Once the Guideline

---

[29] Xisen is not arguing that he is not responsible for committing the crime in which he pled.  Rather, he is merely providing context regarding the purchase and operation of the Passadumkeag property.  Xisen fully accepts responsibility for his actions.

Sentencing Range has been calculated, "sentencing becomes a judgment call" for the court, and the court may construct a sentence varying from the Guideline Range "based on a complex set of factors whose interplay and precise weight cannot even be precisely described." *Iannarelli*, 524 F.3d at 292 (quoting *Martin*, 520 F.3d at 92).   "Ultimately, '[t]here is no single reasonable sentence in any particular case, but, rather, a universe of reasonable outcomes." *United States v. Prosperi*, 686 F.3d 32, 43 (1st Cir. 2012) (quoting *United States v. Walker*, 665 F.3d 212, 234 (1st Cir. 2011)).   The primary mandate of 18 U.S.C. § 3553(a) allows the Court to impose a sentence that is sufficient, but not greater than necessary.

### B.    The Guideline Calculations

Xisen does not dispute the Guideline Calculation made on Page 8, Paragraphs 20 through 29 and Pages 13-14, Paragraph 53 of the *Revised PSIR*.  (ECF No. 53).  However, Xisen argues that there are mitigating factors that call for a significant departure and variance from the guideline range calculated by the *Revised PSIR*, justifying a noncustodial sentence.  There are no mandatory minimums in this case.  The following calculations are applicable to Xisen's sentence:

| Guideline Provision | Description | Offense Level |
| --- | --- | --- |
| U.S.S.G. §§ 2D1.8(a)(1) and 2D1.1(a)(5) | Base Offense Level | 14 |
| U.S.S.G. § 2D1.1(b)(12) | Specific Offense Characteristics | +2 |
| U.S.S.G. § 3B1.1(c) | Specific Offense Characteristics | +2 |
| | Adjusted Offense Level | 18 |
| U.S.S.G. §3E1.1(a), (b) | Acceptance of Responsibility and Assistance | -3 |
| | Total Offense Level | 15 |
| | Criminal History Category I | Guideline Range: 18-24 |

| | | months |
|---|---|---|

### C.    Requested Departures

#### 1.    Xisen's Age

As previously stated, Xisen is 68 years old.  This Court has the ability to depart from the Guideline range based on Xisen's age pursuant to U.S.S.G. § 5H1.1.  "Age may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as, and less costly than, incarceration."  U.S.S.G. § 5H1.1.

In considering such a departure, "age is normally relevant in sentencing only if age-based considerations 'are present to an unusual degree,' and distinguish a particular case in a meaningful way (such as when a defendant is either very young or very old)."  *United States v. Rivera-González*, 776 F.3d 45, 50 (1st Cir. 2015).  U.S.S.G. § 5H1.1.

Multiple Courts within the First Circuit have applied U.S.S.G. § 5H1.1 to downwardly depart from the sentencing guidelines.

In *United States v. Willis*, the court granted a downward departure under U.S.S.G. § 5H1.1 for a 69-year-old defendant with serious health problems, reasoning that his age and physical condition made incarceration particularly risky and inefficient.  322 F. Supp. 2d 76, 84 (D. Ma. 2004).  Similar to *Willis*, Xisen also suffers from serious health problems, such as DVT, degeneration in his spine, and the occluded iliac stent.  *Defendant's Amended Exhibit 1,* at 22, 124-129.  The additional health complications makes Xisen's situation even more serious than the situation in *Willis*.

In *United States v. Baron*, the court granted a downward departure under U.S.S.G. § 5H1.1 for a 62-year-old defendant suffering from liver cancer, finding that his age and infirmity

justified an alternative form of confinement.  914 F. Supp. 660, 665 (D. Ma 1995).  Similar to *Baron*, Xisen is suffering from debilitating health conditions.  *Defendant's Amended Exhibit 1*, at 22, 124-129.  Additionally, as described above, Xisen has a mass effect on his bladder and his blood test indicates there is a probability of "intermediate for aggressive prostate cancer."  *Id*, at 126, 168.

One underlying issue with offenders similar to Xisen's age is the stress of prison and the impact it has on his future.  Prisons have problems managing elderly[30] inmates because of the "vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates, need for special physical accommodations in a relatively inflexible physical environment."[31]  As of October 13, 2021, the average age of the inmate populations in the BOP was 36 years old.[32]

In February of 2016, the Department of Justice, Office of the Inspector General (hereinafter "DOJ-OIG") issued a report titled "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons" (hereinafter "the Report").[33]  The investigation leading to the Report sought to assess the aging inmate population's impact on the BOP's inmate management, including costs, health services, staffing, housing, and programming.  *Report*, at i.

The *Report* reveals that the BOP is unable to adequately care for its aging inmate population.  *Id*, at ii. This aging population is defined as those who are 50 years old and above. *Id*, at i.

---

[30] There is no bright-line definition of an "elderly" person.  The United States Census Bureau defines "elderly" as a person 65 and older; while the National Commission on Correctional Health Care defines "elderly" as a person 55 years or older.  Tina Chiu, *It's About Time: Aging Prisoners, Increasing Costs, and Geriatric Release, New York: Vera Institute of Justice, 2010 (Citation Omitted).*  Xisen is within the age range where incarceration becomes problematic.
[31] B. Jaye Anno et al., Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, Washington, DC: U.S. Department of Justice, National Institute of Corrections, pp 9-10, 2004.
[32] http://www.bop.gov/news/quick.jsp.
[33] https://oig.justice.gov/reports/2015/e1505.pdf

The findings of the *Report* also indicate that the physical infrastructure of the BOP is challenging. *Id,* at i. A shortage of lower bunk beds and handicapped accessible cells provides one of many challenging aspects to the incarceration of aging inmates. *Id*, at ii. Further, the *Report* indicates that the BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose. *Id*.

The *Report* continued, by finding that aging inmates are more costly to incarcerate, primarily due to their medical needs. *Id*, at i. Specifically, aging inmates on average cost 8 percent more per inmate to incarcerate than inmates age 49 and younger. *Id*, at i-ii. "BOP institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care ($10,114) than institutions with the lowest percentage of aging inmates ($1,916)." *Id*, at ii. "BOP institutions with the highest percentages of aging inmates also spent 14 times more per inmate on medication ($684) than institutions with the lowest percentage ($49)." *Id*.

In short, the *Report* challenges the conclusion that the BOP can accomplish its mission statement as it relates to an aging inmate population. *Id*, at 23-24. The *Report* concludes:

> The BOP's mission includes confining federal offenders in controlled environments that are safe, humane, cost-efficient, and appropriately secure. However, the BOP's ability to confine its aging inmate population is insufficient due to overcrowding in its institutions, as well as problems with their internal and external infrastructures. Lower bunks, essential for accommodating aging inmates with mobility limitations or medical conditions, is limited by the overcrowding of BOP institutions . . . Further, aging inmates cannot consistently navigate the narrow sidewalks and uneven terrain at some institutions. Staff and inmates told us that separate housing units, or entire institutions, would be more appropriate to house aging inmates.

*Id*.

In February of 2024, the DOJ-OIG issued another report titled "Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions" (hereinafter "2024 Report").[34]  The *2024 Report* found that "the BOP's response to medical emergencies was often insufficient due to lack of clear communication, urgency, or proper equipment." *2024 Report*, at ii.  "We found that several staffing-related challenges may collectively hinder the BOP's efforts to mitigate inmate deaths . . . BOP staffing shortages contributed to the risk factors we identified for the inmate deaths we reviewed." *2024 Report*, at 64-65.  In nearly half of the inmate deaths that the DOJ-OIG investigated, they found significant shortcomings in BOP staff's emergency responses.  *2024 Report*, at ii.

In October of 2024, in its Semiannual Report to Congress (hereinafter "Semiannual Report"), the DOJ-OIG "identified serious operational deficiencies, including staffing shortages among healthcare workers and COs, substantially impacting the health, welfare, and safety of employees and inmates.[35] *Semiannual Report*, at 23.  "Healthcare worker shortages affect daily functions such as drawing blood, triaging patients, and ensuring that medical equipment and supplies are ready for routine care and medical emergencies." *Id.*  "Especially alarming was the backlog of 725 laboratory orders and 274 pending x-ray orders. Institution management was not always able to fill all inmate-monitoring posts to safely supervise inmates." *Id*.

Congress has not acted to provide adequate resources to the BOP.  The recent enactment of the Federal Prison Oversight Act requires the DOJ-OIG to conduct inspections of the BOP's correctional facilities and provide recommendations to fix problems.[36]  It established an Ombudsman to investigate the health, safety, welfare, and rights of incarcerated people and staff.

---

[34] https://oig.justice.gov/sites/default/files/reports/24-041.pdf
[35] OIG Semiannual Report to Congress for the period from March 31, 2024, to September 30, 2024. https://oig.justice.gov/sites/default/files/semiannual-reports/SARC_April1%2C%202024-September%2030%2C%202024.pdf
[36] https://www.congress.gov/bill/118th-congress/house-bill/3019

Neither the DOJ-OIG, nor the Ombudsman, can provide or ensure adequate medical care for sick inmates.  The underlying problem of inadequate staff and resources remains unaddressed.

For nearly three months the BOP faced a leadership crisis.  On January 20, 2025, the BOP's former director, Colette Peters, was removed from office.[37]  On the same date, William Lanthrop was named as the Acting Director.  *Id*.  Acting Director Lanthrop then reportedly issued a hiring freeze, despite the need for additional staff.  *Id*.  On February 28, 2025, Acting Director Lanthrop retired.  *Id*.  Nearly two months later, on April 12, 2025, William K. "Billy" Marshall III was appointed as Director of the BOP.  *Id*.  In 2023, Mr. Marshall was appointed to lead the troubled West Virginia Corrections Department.[38]  He has never worked at the BOP.  *Id*.

Ms. Peters later described the BOP as "rudderless."[39]  Associate Deputy Director of the BOP, Kathleen Toomey, in her recent testimony before the United States House of Representatives described serious BOP staffing shortages and a $3 billion backlog of unfunded repair projects.[40]  Ms. Toomey testified that staffing shortages threaten safety at BOP facilities including medical care.  *Id*.

The BOP is simply not equipped to handle an aging population of inmates.  As a result, incarceration will be a much harder road for Xisen than many other inmates, making the age-based departure that much more critical.

### 2.    Xisen's Health

In conjunction with Xisen's age, his medical and mental health conditions should be considered to depart from the sentencing guidelines.  As described above, the BOP has shown that it is unable to provide adequate care for Xisen's medical needs.

[37]
https://www.forbes.com/sites/walterpavlo/2025/02/17/bureau-of-prisons-executives-announce-retirement-ahead-of-new-director/
[38] https://www.themarshallproject.org/2025/04/12/billy-marshall-facts-trump-federal-prisons
[39] https://www.forbes.com/sites/walterpavlo/2025/03/28/bureau-of-prisons-is-rudderless-operation/
[40] https://docs.house.gov/meetings/AP/AP19/20250226/117920/HHRG-119-AP19-Wstate-ToomeyK-20250226.pdf

U.S.S.G. § 5H1.4 provides that:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

Multiple courts[41] have applied U.S.S.G. § 5H1.4 when they are doubtful that the BOP can adequately provide medical treatment and incarceration risks shortening a defendant's lifespan.

In *United States v. Martin*, the Court determined that several serious medical conditions were present that made the defendant's health exceptionally fragile. 363 F.3d 25, 50 (1st Cir. 2004). The court emphasized that such a departure is warranted when imprisonment would threaten or shorten the defendant's life or when the BOP cannot adequately meet the defendant's medical needs. *Id*, at 49. The Court was not convinced that the BOP could adequately provide for the defendant's medical needs during an extended prison term. *Id*. The Court found that there was a high probability that lengthy incarceration will shorten the defendant's life span. *Id*. Similar to *Martin*, Xisen would be unusually susceptible to harm and would be extremely vulnerable to the risk of death in prison because of an emergent need of medical and surgical attention for his many medical issues described above. The BOP simply cannot adequately meet Xisen's medical needs.

In *United States v. Johnson*, the Court reviewed 500 pages of medical records and concluded that imprisonment posed a substantial risk to the defendant's life. 71 F.3d 539, 545 (6th Cir. 1995). While the *Johnson* Court considered a BOP letter stating that they could take care of any medical issues, the Court determined that it was merely a form letter "trumpeting

---

[41] Additionally, see *supra*: *Willis* and *Baron*.

BOP capability." *Id.* The *Johnson* Court remanded to the lower court to make more specific findings as to whether the defendant has "an extraordinary physical impairment," or combination of impairments, worthy of departure. *Id*, at 545.

In this case, Xisen's medical issues are present to an unusual degree and distinguishes this case from the typical cases covered by the guidelines. Xisen's medical issues are fragile to the extent that incarceration poses a significant risk of shortening his lifespan. Although Xisen may currently be able to provide self-care, his condition is almost certainly going to worsen in prison to the point that he will not be afforded appropriate medical care within a correctional facility. Xisen must be able to rely on multiple medical providers in order to manage his medical conditions. His DVT poses an acute risk of death or serious harm and his occluded stent needs to be replaced or repaired. *Defendant's Amended Exhibit 1*, at 164. See fn. 13 and fn. 21. If a blood clot in his leg were to break free, it could cause a pulmonary embolism, which is life-threatening and requires immediate medical attention.[42] Lastly, an MRI or biopsy of his prostate needs to occur in order to confirm or rule out prostate cancer. *Defendant's Amended Exhibit 1*, at 164 and 168.

The totality of Xisen's medical conditions alone strongly urge against incarceration. The BOP's limitations in providing elder care, coupled with the immediate dangers of Xisen's medical issues are significant mitigating factors. The Sentencing Guidelines justify an alternative form of confinement, suggesting home confinement. If this Court were to order his incarceration in a BOP facility, the evidence suggests that the BOP would be unable to meet Xisen's daily needs. The recommendation here, which avoids traditional BOP incarceration altogether, aligns with the DOJ-OIG recommendation that community housing be employed as

---

[42] https://www.mayoclinic.org/diseases-conditions/pulmonary-embolism/symptoms-causes/syc-20354647

an alternative to BOP incarceration when appropriate. Xisen's extraordinary physical impairments justify a downward departure.

### 3.    Xisen Voluntarily Forfeited $24,710

Pursuant to U.S.S.G. § 5K2.0 "[the] sentencing court may depart from the applicable guideline range if . . . the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance . . . of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described."

As set forth in the Preliminary Order of Forfeiture, Xisen voluntarily agreed to a forfeiture of "$4,710.00 in United States Currency from 549 Main Street, Passadumkeag, Maine, seized on February 22, 2024; and $20,000.00 in United States Currency as cash in lieu of—or substitute res for—that real property." (ECF No. 50).

Prior to the entry of the written plea agreement, Xisen did not need to agree to the forfeiture; he could have litigated that issue. Xisen, through GC 168 Realty, owned the Passadumkeag property outright. As of this date, the property has been sold. Xisen gave up his residence and shelter, which cannot be understated. This sacrifice is a significant step in an attempt to make amends for his crimes. After all, Xisen is giving up the same "vehicle" used to commit his crimes.

This circumstance is not adequately taken into consideration by the Sentencing Guidelines and should serve as a departure from the guidelines pursuant to U.S.S.G. § 5K2.0.

### D.    Xisen's Personal Background and Characteristics and the Section 3553 Sentencing Factors

In sentencing Xisen, this Court is tasked with applying the principles of 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary" to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." A custodial sentence would not only be much greater than necessary, it would likely be the last resting place for Xisen.

1.    **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

*i.    Nature and Circumstances of the Offense*

While the seriousness of Xisen's offense is patent, there is no evidence that Xisen acted with any sort of malice or intention to harm anyone. Xisen will not attempt to minimize or make excuses for his illegal activities, nor will he try to suggest he not be punished for his serious wrong-doing. He recognizes his role in the offense, has accepted responsibility, and has taken steps to make amends for his actions.

*ii.    History and Characteristics of Xisen*

As described above, Xisen has significant health needs that cannot be met by the BOP. In combination with his age, it will be very problematic for the BOP to meet his needs.

Xisen was born into a life of unimaginable poverty in rural, communist China. He lived through one of the deadliest famines in world history. Even as an adult, he struggled to scrape by due to the CCP's employment policies. The protests against these policies and the CCP's harsh reaction caused enough chaos to make Xisen feel unsafe in China. Xisen emigrated to escape lifelong poverty and civil unrest.

When Xisen arrived in the United States, he immediately became a productive member of society. This trend continued for almost thirty years. Xisen's criminal behavior in this case is entirely antithetical to his otherwise law-abiding life. This is further supported by his conduct while on pretrial release since April 23, 2024. Xisen's probation was transferred to New York in February, 2025, and he has been supervised there since. Xisen made multiple trips back and forth from New York without issue. Aside from the two instances when left his residence early,[43] Xisen's pretrial release has been a complete success.

At 68 years old, Xisen has no criminal history. This process has been a turning point in Xisen's life. The guilt, shame, fear, and anxiety he has experienced as a result of his criminal conduct and the legal ramifications inspired significant introspection. The threat of incarceration has forced him to confront his wrongdoing and the realities surrounding his age and declining health. Most importantly, Xisen hopes to spend what time he has left to connect with his children.

### 2. The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

A noncustodial sentence would achieve each of these aims. Ultimately, the seriousness of Xisen's offense must be balanced against his individual characteristics and the other § 3553(a) factors. Taken as a whole, and in light of Xisen's history and characteristics, a noncustodial sentence is necessary in this matter in order for this Court to impose a sentence that is sufficient, but not greater than necessary.

### 3. The Need to Afford Adequate Deterrence and Protect the Public

Deterrence as a sentencing rationale is subject to limitation. As the First Circuit states:

---

[43] Xisen's probation officer reminded him of his obligation to strictly abide by the curfew, and there have been no issues since.

> The court's duty to "individualize" the sentence simply means that, whatever the judge's thoughts as to the deterrent value of a jail sentence, he must in every case reexamine and measure that view against the relevant facts and other important goals such as the offender's rehabilitation. Having done so, the district judge must finally decide what factors, or mix of factors, carry the day.

*United States v. Foss*, 501 F.2d 522, 528 (1st Cir. 1974).

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. See Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999)[44] (concluding that correlations between sentence severity and crime rates were not sufficient to achieve statistical significance, and that the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects); see also Michael Tonry, *Purposes and Functions of Sentencing*, Crime and Justice: A Review of Research, Vol. 34, at 28-29 (2006)[45] ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Science panels, all appointed by Republican presidents . . . reached that conclusion, as has every major survey of the evidence."); see also Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, Criminology, Vol. 48, at 357 (2009)[46] (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their

---

[44]

https://www.ojp.gov/ncjrs/virtual-library/abstracts/criminal-deterrence-and-sentence-severity-analysis-recent-research

[45] https://scholarship.law.umn.edu/cgi/viewcontent.cgi?article=1504&context=faculty_articles

[46] https://onlinelibrary.wiley.com/doi/10.1111/j.1745-9125.2010.00189.x

counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guideline*s, Research Series On The Recidivism Of Federal Guideline Offenders, at 15 (2004)[47] (hereinafter "Sentencing Commission Report"), see also Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, The Prison Journal Supplement to 91(3), at 50S (2011)[48] (concluding "having pulled together the best available evidence, we have been persuaded that *prisons do not reduce recidivism more than noncustodial sanctions*").

Older offenders are less likely to recidivate than younger offenders. In 2004, the Sentencing Commission found that within two years of their release, an offender over the age of 50, with a criminal history Category I, had a 6.2% chance in committing a new criminal offense following their release. *Sentencing Commission Report*, at 28. A person under the age of 21, with a criminal history Category I, had a 29.5% chance in committing a new criminal offense following their release. *Id*. The *Sentencing Commission Report* supports the premise that the older a person gets, the less likely they will recidivate. *Id*, at 16.

The DOJ-OIG supports the same conclusion. The DOJ-OIG determined that the aging inmate population has a lower rate of re-arrest after release than their younger counterparts.

---

[47]

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

[48] http://www.antoniocasella.eu/nume/Cullen_2011.pdf

*Report*, at i.  For all federal inmates, the rate of re-arrest is 41%.  *Report*, at iii.  Among the aging inmate population, the rate of re-arrest is 15%.  *Report*, at ii.  The re-arrest rate for an inmate in Xisen's age category is even lower, at an 11% re-arrest rate.  *Report*, at 40.  Of those aging inmates that were re-arrested, 86% of them were already known recidivists prior to release. *Report*, at 41.

### 4.    Early Acceptance and Plea

On April 19, 2024, Xisen appeared before this Court for an initial appearance on the Government's Complaint (ECF No. 3).

On January 13, 2025, Xisen appeared before this court again for a plea hearing.  Xisen waived indictment and pled by Information to charges mirroring the Complaint.  While this is a very serious offense, Xisen recognized his role and has accepted responsibility.  Xisen's plea and waiver of indictment spared the Government from preparing for, and expending significant resources on, the grand jury and the pretrial and trial processes.

## V.    CONCLUSION AND REQUESTED SENTENCE

Xisen will not make excuses for his drug activities, nor will he try to suggest he not be punished for his serious wrong-doings.  Ultimately, the seriousness of his offense must be balanced against his individual characteristics, the appropriate departures, and the 18 U.S.C § 3553 factors and objectives.  Taken as a whole and in light of Xisen's personal history, age and medical issues, a large variant sentence is necessary in this matter in order for this Court to impose a sentence that is sufficient, but not greater than necessary.  A noncustodial sentence is appropriate here.  *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (*en banc*).

For all of these reasons, and for the reasons stated at the Sentencing Hearing, we respectfully ask the Court to impose a time-served sentence followed by probation with a period of home detention with electronic monitoring that is significant in this Court's judgment.

Dated this 5th day of September, 2025 in Portland, Maine.

Respectfully Submitted,

/s/ Stephen M. Sweatt, Bar No. 6270
Counsel for Xisen Guo
ZERILLO LAW FIRM, LLC
1250 Forest Avenue, Ste 3A
Portland, ME 04103
*stephen@zerillolaw.com*

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. 1:24-cr-00144-JAW** |
| | ) | |
| XISEN GUO | ) | |
| | ) | |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

I, Stephen Sweatt, hereby certify that I have caused the above DEFENDANT'S REVISED SENTENCING MEMORANDUM to be electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record, along with United States Probation.

Dated this 5th day of September, 2025 in Portland, Maine.

Respectfully Submitted,
ZERILLO LAW FIRM, LLC

/s/ Stephen M. Sweatt, Bar No. 6270
Counsel for Xisen Guo
1250 Forest Avenue, Ste 3A
Portland, ME 04103
*stephen@zerillolaw.com*